UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LYNETTE KIRCHNER, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 1299 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| P.O. JOHNNY THOMAS, DETECTIVE DARRYL MANNING, DETECTIVE SERGEANT JIM DAVIS, DETECTIVE STEVEN MOODY, P.O. SHERYL COLLINS, and COOK COUNTY, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this suit under 42 U.S.C. § 1983, Lynette Kirchner alleges that several Cook County Sheriff officers unlawfully seized and imprisoned her in violation of the Fourth Amendment. Doc. 7. A one-week trial has been set for May 11, 2015. Doc. 33. Defendants have moved for summary judgment. Doc. 34. The motion is denied.

## Background

The following facts are stated as favorably to Kirchner, the non-movant, as the record and Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). In considering Defendants' summary judgment motion, the court must assume the truth of those facts, but it does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

At 8:00 a.m. on December 6, 2012, Cook County Sheriff officers Johnny Thorns and Darryl Manning arrived at Kirchner's home. Doc. 46 at ¶ 1; Doc. 52 at ¶ 3. Kirchner, who had gone to bed just a few hours earlier and had been unable to sleep, answered the door and invited the officers to step inside. Doc. 46 at ¶ 15; Doc. 52 at ¶¶ 2, 6. The officers were not in uniform, although one and possibly both wore a vest with the word "SHERIFF" across the front, and one

1

officer showed his badge. Doc. 46 at ¶ 5; Doc. 52 at ¶¶ 3-4. Both officers were armed, but Kirchner was unable to see the weapons underneath their clothing. Doc. 46 at ¶ 12.

The officers asked Kirchner to accompany them to the Cook County Sheriff's office at the Markham courthouse for questioning. *Id.* at ¶ 1; Doc. 52 at ¶ 5. Kirchner told the officers that they could question her inside her home, but they refused, telling her that she "had to go with them" to the courthouse. Doc. 52 at ¶ 5. Kirchner replied that she was "exhausted" and that she needed to get some sleep before answering their questions. *Id.* at ¶ 6. Again the officers told Kirchner that she "had" to go with them, noting that she could sleep in the car; the officers were "polite" but "stern," and Kirchner assented, feeling that she "did not have a choice." Doc. 46 at ¶ 23; Doc. 52 at ¶¶ 6-8. Kirchner offered to drive to the courthouse in her own car, but the officers said that they had to drive her themselves. Doc. 52 at ¶ 9.

After arriving at the Sheriff's office, Kirchner was patted down and placed in an interview room. Doc. 46 at ¶¶ 30-31. Two walls in the room were covered with large splotches of blood and feces. Doc. 52 at ¶¶ 12-14. Kirchner tried to open the door, but it was locked. *Id.* at ¶ 15. Two other officers, Steven Moody and Jim Davis, then entered the room. *Id.* at ¶ 16. Moody began to question Kirchner about a June 2012 shooting involving a man named Antwaan Bryant; Kirchner denied witnessing any shooting, complained that she was tired and that her head was fuzzy, and asked to go home and come back to talk to the officers after getting some sleep. *Id.* at ¶¶ 16-19. Moody replied that Kirchner could not leave until she told them what they wanted her to say about the shooting. *Id.* at ¶ 20. Moody even told Kirchner what her statement should say: that while sitting in her car and talking on the phone, she observed Bryant shoot somebody. *Id.* at ¶ 21. Moody said that Bryant was going to jail and that they needed "this" statement from her. *Id.* at ¶ 22.

Kirchner again told Moody that she wanted to go home, and she also asked for a lawyer, stating that her "mind was not clear" and that she needed someone to explain her rights. *Id.* at ¶¶ 23-24. Moody told Kirchner that she could not have a lawyer and repeated that she could not leave until she gave a statement. *Id.* at ¶ 25. When Kirchner complained about the condition of the interview room, Moody threatened to arrest her and take her downstairs, where it was "worse." *Id.* at ¶ 26. Moody told Kirchner to "think about it," and he and Davis left the room. *Id.* at ¶ 27.

A fifth officer, Sheryl Collins, then entered the room, and Kirchner asked Collins at least three times for an attorney. *Id*. at ¶ 29. Kirchner also asked to be moved to a different room, and she informed Collins that she was diabetic and had felt threatened by Moody and Davis. Collins agreed with Kirchner that Moody and Davis were "going to lock [her] up" and told her that no other rooms were available. *Id.* at ¶¶ 30-32. Collins left the room at some point, locking the door and "fiddl[ing] around with the handle" so that Kirchner could tell it was locked. *Id.* at ¶ 33.

Eventually, Kirchner told Collins that she was willing to make a statement about the July 2012 shooting, but she made clear that the officers had told her what to say and that she did not know about the shooting. *Id.* at ¶ 34. Collins accompanied Kirchner to Assistant State's Attorney Kolasa's office, where Kolasa took Kirchner's statement, printed it, and reviewed it with her. Doc. 46 at ¶¶ 54-61. After making some corrections, Kirchner signed each of the statement's four pages, including the page that said, "Lynette states that she signed each and every page to show that it is accurate" and "Lynette states that everything in this statement is true and correct." *Id.* at ¶¶ 62-63; Doc. 35-8 at 4. Kirchner was given a turkey sandwich to eat and

water to drink, and she was able to administer her diabetes medication and use the restroom. Doc. 46 at ¶¶ 66-69.

Defendants argue that the assertions in Kirchner's Local Rule 56.1(b)(3) materials that her signed witness statement was coerced and the product of being held against her will cannot be reconciled with the statement itself and therefore should be disregarded. It is true that Kirchner's signed statement says that "no threats or promises have been made to [Kirchner] to get her to make this statement and that she is giving this statement freely and voluntarily." Doc. 35-8 at 3. And Defendants correctly cite *Janky v. Lake County Convention and Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009), and *Dobbey v. Zhang*, 2013 WL 4838916, at *2 (N.D. Ill. Sept. 10, 2013), for the proposition that "litigants cannot create sham issues of fact with affidavits that contradict their prior depositions." However, Kirchner has not submitted an affidavit in opposition to summary judgment, and her signed witness statement is not a deposition, but rather a document that she claims was coerced and falsely coached. On summary judgment, the court cannot conclude that the representations in Kirchner's statement were freely given and truthful as opposed to coerced and false. Accordingly, the court will not disregard the relevant assertions in Kirchner's Local Rule 56.1(b)(3) materials.

## Discussion

Kirchner alleges that Thomas, Manning, Davis, Moody, and Collins violated her Fourth Amendment rights. To hold Defendants liable for violating the Fourth Amendment, Kirchner must show both that she was seized and that the seizure was unreasonable. *See Brower v. County of Inyo*, 489 U.S. 593, 599 (1989).

Defendants argue that the undisputed facts show that Kirchner was not "seized" within the meaning of the Fourth Amendment and, in the alternative, that they have qualified immunity

4

from suit. With one minor qualification noted in Section II, *infra*, Defendants do not argue that any seizure was reasonable under the Fourth Amendment, and so any such argument is forfeited for summary judgment purposes. *See Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("[w]hen a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on"); *Rogers v. Waukegan Pub. Sch. Dist. 60*, 924 F. Supp. 2d 940, 954 (N.D. Ill. 2013).

**I.     Whether Kirchner Was Seized**

Defendants first argue that Kirchner was not seized within the meaning of the Fourth Amendment. Doc. 36 at 3-12. A person is "seized" under the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Tyler*, 512 F.3d 405, 409-10 (7th Cir. 2008). When police approach a person in a closed environment like a home rather than in public, the "free to leave" terminology is an imperfect fit, so the inquiry instead is whether "a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *United States v. Jerez*, 108 F.3d 684, 689-90 (7th Cir. 1997). In either case, "[t]he

5

reasonable person-free to leave standard is an objective one, and both the officer's and the encountered individual's subjective beliefs during the encounter are not determinative as to whether a seizure occurred." *Carlson v. Bukovic*, 621 F.3d 610, 619 n.15 (7th Cir. 2010).

"[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). Relevant factors include:

> [1] whether the encounter took place in a public place or whether police removed the person to another location; [2] whether the police told the person he was not under arrest and was free to leave; [3] whether the police informed the person that he was suspected of a crime or the target of an investigation; [4] whether the person was deprived of identification or other documents without which he could not leave (such as a driver's license or train or airline ticket); and [5] whether there was any limitation of the person's movement such as physical touching, display of a weapon, or other coercive conduct on the part of the police that indicates cooperation is required

*Tyler*, 512 F.3d at 410; *see also United States v. McCarthur*, 6 F.3d 1270, 1275-76 (7th Cir. 1993) (noting that the inquiry is "highly fact-specific").

Kirchner has adduced evidence, viewed in the light most favorable to her, sufficient to allow a reasonable jury to find that a reasonable person in her shoes would not have believed herself free to decline Thorns and Manning's request to accompany them to the courthouse. Police of course are "entitled to invite witnesses … to the police station … for questioning." *Hall v. Bates*, 508 F.3d 854, 857 (7th Cir. 2007). But although the encounter between Kirchner and the officers began consensually, that changed when Kirchner said she did not want to go the courthouse. *See United States v. Adebayo*, 985 F.2d 1333, 1338 (7th Cir. 1993) (noting that a "consensual encounter can develop into an investigatory detention as a consequence of police behavior"). Kirchner said that she wanted to answer questions in her home or after getting some sleep, and both times the officers told her she "*had to* go with them" anyway. Doc. 52 at ¶¶ 5, 7

(emphasis added). A reasonable jury could find that she reasonably believed herself unable to decline that demand.

It is true that Thorns and Manning did not raise their voices, display their weapons, or tell Kirchner that she was under arrest, factors that cut against a finding that Kirchner was seized. Nevertheless, each time Kirchner declined to accompany the officers to the Sherriff's office, she was told she had to cooperate on the officers' terms. *See Jerez*, 108 F.3d at 691-92 ("Once the officers had been refused admittance, their continued efforts to rouse the occupants out of bed certainly prevented them from ignoring the continued requests and maintaining the privacy and solitude of their dwelling."); *cf. United States v. Drayton*, 536 U.S. 194, 203 (2002) (finding no seizure where officers boarded a bus and began questioning passengers but "gave the passengers no reason to believe that they were required to answer the officers' questions"). Kirchner therefore had very good reason to think her compliance was required: Thomas and Manning said so, twice. And when she agreed to comply, Kirchner learned that she could not drive to the courthouse herself but had to be brought in the back seat of a police vehicle—hardly the stuff of voluntary cooperation. *See Dunaway v. New York*, 442 U.S. 200, 212 (1979) (finding a seizure where the petitioner "was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room").

Citing *United States v. Scheets*, 188 F.3d 829, 842 (7th Cir. 1999), and *United States v. Jones*, 21 F.3d 165, 170 (7th Cir. 1994), Defendants argue that Kirchner could not have been seized because neither Thorns nor Manning used the sorts of "strong-arm tactics" that would support finding that she was "in custody" for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966). Doc. 36 at 6-8. On the surface, the "custody" inquiry under the Fifth Amendment may seem equivalent to the "seizure" inquiry under the Fourth Amendment. *See United States v.*

*Valley*, 755 F.3d 581, 585 (7th Cir. 2014) ("Whether [a person] was 'in custody' for purposes of *Miranda* depends on whether a reasonable person in the same setting would not have felt free to leave."). They are not equivalent, however, as a person can be "seized" within the meaning of the Fourth Amendment even though she is not "in custody" within the meaning of the Fifth. In *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984), the Supreme Court held that police are not obligated to give *Miranda* warnings after a *Terry* stop or traffic stop, even though these stops are Fourth Amendment seizures. *See United States v. Williams*, 731 F.3d 678, 693 (7th Cir. 2013) ("When a *Terry* stop is authorized, the subject of the stop is not free to walk away."). This makes Fifth Amendment precedents like *Scheets* and *Jones* inapposite. *See United States v. Streifel*, 781 F.2d 953, 960 (1st Cir. 1986) ("The district court mistakenly thought that the principal criterion for determining whether Streifel and Quinn were in custody for the purposes of *Miranda* was whether 'a reasonable person in Defendants' position would have believed he was not free to leave.' The Supreme Court has recently made clear, however, that this is the standard for determining whether a person has been seized within the meaning of the fourth amendment, but is not alone determinative of whether he has been placed in custody for the purposes of the fifth. In *Berkemer v. McCarty,* the Court expressly recognized that an ordinary traffic stop curtails the freedom of the detained vehicle's occupants to drive away. Nonetheless, the Court held that such stops are usually analogous only to a *Terry* stop, and so not subject to the dictates of *Miranda*.") (citation omitted). In any event, in *Scheets* and *Jones*, the police officers informed the person being questioned that he "was free to leave." *See Scheets*, 188 F.3d at 834; *Jones*, 21 F.3d at 170. Here, by contrast, Thorns and Manning told Kirchner the exact opposite—that she "had" to come in for questioning.

Kirchner also has adduced evidence sufficient to show that she was seized by Moody and Davis. Moody and Davis questioned Kirchner while she was locked in an interview room, despite Kirchner telling Moody that her head hurt and that she wanted to go home. Doc. 52 at ¶¶ 15, 23-24. Rather than break off his questioning, Moody told Kirchner that she could not leave until she gave the officers a concocted statement; later, he threatened to arrest Kirchner and to put her in a "worse" room. *Id.* at ¶¶ 25-27. Although Defendants correctly point out that there is no "*Miranda*-like rule requiring police whenever they question someone at a police station to advise him that he is not under arrest and is therefore free to leave at any time," *Hall*, 508 F.3d at 857, Kirchner did ask to leave, only to be told she had to stay. Indeed, in rejecting such a *Miranda*-like rule, the Seventh Circuit reasoned, "It's as if one were in a room with the door closed and rather than turning the knob one sued for false imprisonment, though in fact the door was not locked." *Id.* at 858. Yet Kirchner *did* turn the knob—literally, Doc. 52 at ¶ 15—and in fact the door *was* locked. That amounts to a Fourth Amendment seizure.

Defendants argue that even if Moody effectuated a seizure by allegedly threatening Kirchner, Davis should be dismissed as a party defendant because "under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (internal quotation marks omitted). However, Davis did participate in the constitutional deprivation because he was physically present at and participated in the interview in which Kirchner was (arguably) seized. *See Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) ("To be personally responsible, an official must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.") (internal quotation marks omitted). An officer present during the use of excessive force cannot defeat § 1983 liability merely by claiming that another officer actually landed the blows. *See Miller v. Smith*,

9

220 F.3d 491, 495 (7th Cir. 1982). Likewise, Davis cannot avoid liability simply by claiming that his fellow questioner, and not he, actually made the threats that deprived Kirchner of her freedom to leave. *See Knight*, 590 F.3d at 463.

Finally, Kirchner has adduced evidence sufficient to show that she was seized by Officer Collins. Although Collins, unlike Moody, was not aggressive or threatening, Kirchner told Collins that she wanted to go home, and Collins not only continued to question Kirchner, but agreed that Kirchner would be locked up if she did not comply. Doc. 52 at ¶ 31. Like Davis, Collins arguably also had personal knowledge of Murphy's unlawful threats and turned a blind eye. *See Knight*, 590 F.3d at 563. More importantly, Collins locked the door upon exiting the interview room. Doc. 52 at ¶ 33. Once more construing the facts in the light most favorable to Kirchner, a jury could conclude that Collins seized her when locking her in the interview room after she declared that she wanted to go home.

## II. Qualified Immunity

In addition to arguing that Kirchner was not seized at any point on December 6, 2012, Defendants argue that they are entitled to qualified immunity. Doc. 36 at 12-15. "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). Whether a defendant is entitled to qualified immunity depends on two questions: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right[,] and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013).

The court has already explained why the summary judgment record, taken in the light most favorable to Kirchner, make out a violation of the Fourth Amendment's prohibition against unreasonable seizure. This leaves the question whether that right was clearly established. "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal citations omitted and alteration in original).

As previously noted, Defendants do not attempt—with one qualification discussed below—to argue that they had an objective justification for detaining Kirchner. They argue only that her interactions with the officers were consistently voluntary. It has long been clear that "police questioning, by itself, is unlikely to result in a Fourth Amendment violation. … But if the person[] refuses to answer and the police take additional steps … to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984). It was clearly established in December 2012 that once a person has actually refused to interact with the police, *some* level of individualized suspicion is necessary to authorize even a temporary seizure. *See Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000) ("At the time the search of Jacobs' apartment was conducted, it was clearly established that a citizen may not be detained by law enforcement officials without probable cause."); *Jerez*, 108 F.3d at 693 ("Because Deputies Hurrle's and Lent's actions, when considered in their totality, amount to an investigatory stop, the deputies must have had a reasonable suspicion supported by articulable facts that criminal activity may have been afoot.") (internal quotation marks and alterations omitted). As such, any reasonable official would have known that requiring Kirchner to come to the Sherriff's office for

questioning, or detaining her after she said she wanted to go home, violated the Fourth Amendment—unless the officers had probable cause to detain her, which Defendants do not argue they had.

Defendants do contend—and here's the qualification—that it may have been reasonable for Moody and Davis to threaten Kirchner with arrest. By denying that she knew anything of the shooting, Defendants contend, Kirchner gave a reasonable officer either probable cause or reasonable suspicion to think that she was obstructing justice. Doc. 36 at 14. Reasonable suspicion alone would not justify a threat of arrest, of course; arrests require probable cause—or, for qualified immunity purposes, "arguable probable cause." *See Abbot v. Sangamon County*, 705 F.3d 706, 714-15 (7th Cir. 2013). And even if Kirchner's denials created arguable probable cause, it was too late. Kirchner was seized once Moody and Davis, questioning her in a locked room, told her she could not leave until she made a statement. The fact that Moody and Davis might *later* have suspected Kirchner of obstructing justice cannot retroactively justify the initial seizure. *See Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the officer at the time he acts.") (internal quotation marks omitted).

## Conclusion

For the foregoing reasons, Defendants' summary judgment motion is denied. Kirchner's § 1983 claim against all Defendants will proceed to trial.

December 2, 2014

United States District Judge